RENDERED: APRIL 27, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000526-WC

MARSHALL PARKER                                                        APPELLANT


ON APPEAL FROM COURT OF APPEALS
CASE NO. 2013-CA-001978-WC
V.              WORKERS' COMPENSATION BOARD
NO. 09-WC-99663


WEBSTER COUNTY COAL, LLC (DOTIKI                         APPELLEES
MINE); HON. STEVEN G. BOLTON,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD


AND                     2014-SC-000536-WC


WEBSTER COUNTY COAL, LLC (DOTIKI MINE)                    APPELLANT


ON APPEAL FROM COURT OF APPEALS
CASE NO. 2013-CA-001968-WC
V.              WORKERS' COMPENSATION BOARD
NO. 09-WC-99663


MARSHALL PARKER;                                          APPELLEES
MULTICARE MADISONVILLE; DR.
RICHARD HOLZKNECHT; COOP HEALTH
SERVICES; DEACONESS HOSPITAL;
DAVID D. EGGERS, M.D.;
NEUROSURGICAL CONSULTANTS; JAMES
M. DONLEY, M.D.; CENTER FOR
ORTHOPEDICS; WAYNE C. COLE, D.O.;
KELLY L. COLE, D.O.; HON. STEVEN G.
BOLTON, ADMINISTRATIVE LAW JUDGE;
AND WORKERS' COMPENSATION BOARD

**OPINION OF THE COURT BY JUSTICE KELLER**

**AFFIRMING IN PART AND REVERSING**
**AND REMANDING IN PART**

In separate appeals, Marshall Parker challenges the constitutionality of Kentucky Revised Statute (KRS) 342.730(4) and Webster County Coal (Webster County) challenges the Administrative Law Judge's (ALJ) award of benefits to Parker for a back injury. The Board affirmed the ALJ's award of benefits but, because it lacks the jurisdiction to do so, the Board did not address Parker's constitutional claim.[1] The Court of Appeals affirmed the Board and found that KRS 342.730(4) is constitutional. For the following reasons, we affirm the Court of Appeals regarding Parker's entitlement to benefits. However, we reverse that Court's holding that KRS 342.730(4) is constitutional and remand this matter to the ALJ for an award consistent with this opinion.

## I. BACKGROUND.

Parker was born on October 5, 1939, and he began working as an underground coal miner for Webster County in 1974. On September 8, 2008, Parker slipped while trying to climb over a conveyor belt. He testified that he felt pain in his right knee, right hip, and low back after this incident. Despite his injuries, Parker continued to work for approximately three months. Parker eventually underwent right knee surgery in December 2008 and lumbar spine

---

[1] The Board noted in its opinion that Webster County filed a number of medical fee disputes while the appeal was pending and that the ALJ had issued an order joining additional parties after the notice of appeal had been filed. Because the ALJ lost jurisdiction once the notice of appeal was filed, the Board vacated his order. Furthermore, the Board remanded the medical fee disputes for a determination on the merits and on the necessity of joining additional parties. Neither party has contested this portion of the Board's opinion; therefore, we do not address it.

2

surgery in June 2011. Following treatment, Parker has continued to have back pain, and he has difficulty walking and climbing stairs. He has not returned to any type of work.

Webster County accepted liability for Parker's right knee injury and has paid all medical benefits associated with that injury. Because Webster County is not contesting Parker's knee injury claim, we do not set forth the medical evidence regarding that claim. However, Webster County did contest Parker's back injury claim based on medical records containing pre-injury complaints of low back pain and diagnostic testing that showed significant degenerative changes. Therefore, we summarize the medical evidence related to that claim below.

In support of his back injury claim, Parker filed medical records and a report from his spine surgeon, Dr. David Eggers. In his May 20, 2009 office note, Dr. Eggers stated that Parker had suffered from "intractable low back and right radicular leg pain" since an injury in September 2008. In his Form 107 Medical Report – Injury/Hearing Loss/Psychological Condition, Dr. Eggers stated that Parker suffered from displacement of a lumbar disc, spinal stenosis, and acquired spondylolisthesis. Dr. Eggers related these conditions to Parker's injury; however, he did not specify the date of the injury. Furthermore, although he had been asked to do so, Dr. Eggers would not give an opinion regarding what permanent impairment or restrictions Parker has.

Webster County filed records from Tri-State Orthopedic Surgeons and Dr. James Donley. The Tri-State records showed, in pertinent part, that Parker

3

complained of and sought treatment for low back and leg pain in September 2003, March 2005, and May 2006. It appears from the records that Parker received at least one epidural steroid injection in late 2005 and one epidural steroid injection in May 2006. Furthermore, Parker's 2003 lumbar MRI revealed multi-level degenerative changes with mild to moderate stenosis. Dr. Donley's records reveal, in pertinent part, that Parker complained of aches and pains/strains but had not received any treatment for back pain in the two years before the work injury.

Webster County also filed reports from Dr. Russell Travis, Dr. Bart Goldman, and Dr. William Gavigan. Dr. Travis, in his October 9, 2009 report, stated that Parker suffered from right L4 radiculopathy secondary to degenerative spondylolisthesis with a bulging disc at L4-5 and significant degenerative changes throughout the lumbar spine. Dr. Travis concluded that, despite Parker's significant pre-existing lumbar degenerative changes, the surgery then being recommended by Dr. Eggers was work-related. In reaching that conclusion, Dr. Travis stated that he had seen "no records that indicate Mr. Parker had significant low back pain and no right lower extremity pain prior to this." In a November 20, 2009 addendum to his October report, Dr. Travis stated that, upon review of an office note from one of Parker's physicians dated September 28, 2009, Parker's "current problem is not related directly to the injury of 9/28/2008, but is clearly a question of pre-existing severe degenerative changes with neural impingement and previous symptomatic

4

problems with his low back." We note that Dr. Travis had reviewed and summarized the September 28, 2008 office note in his October 2009 report.

Dr. Goldman stated that Parker suffered from degenerative retrolisthesis at L3-4 which pre-existed the September 8, 2008 work-injury. According to Dr. Goldman, the surgery performed by Dr. Eggers was to alleviate an active pre-existing condition, not because of Parker's work injury.

Dr. Gavigan made diagnoses of severe degenerative disc disease that actively pre-existed the work injury. He opined that all of Parker's back treatment was related to that pre-existing active condition and not to the work injury. Finally, Dr. Gavigan, who imposed no restrictions, assigned Parker a 22% impairment rating, all of which he attributed to the pre-existing active condition.

Based on the preceding evidence, the ALJ found that Parker suffered a lower back injury on September 8, 2008 and that none of Parker's back-related impairment was the result of a pre-existing active "disability/impairment of the back under the holding in *Finley* (supra)."[2] The ALJ also determined that Parker is not totally disabled and awarded income benefits based on Parker's 4% knee impairment and his 22% lumbar spine impairment for a combined permanent impairment rating of 26%. However, because Parker had already received two years of temporary total disability income benefits, the ALJ found that Webster County did not have liability for payment of any additional

---

[2] *Finley v. DBM Techs.*, 217 S.W.3d 261 (Ky. App. 2007).

income benefits pursuant to KRS 342.730(4). The Board and the Court of Appeals affirmed.

As noted above, both Webster County and Parker have appealed from the Court of Appeals's opinion. Webster County argues that the evidence did not support the ALJ's award of benefits related to Parker's low back condition. Parker appeals the ALJ's termination of income benefits pursuant to KRS 342.730(4). We set forth additional necessary background information below.

## II. STANDARD OF REVIEW.

The ALJ has the sole discretion to determine the quality, character, and substance of the evidence and may reject any testimony and believe or disbelieve various parts of the evidence regardless of whether it comes from the same witness or the same party's total proof. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). Parker had the burden of proving that his back condition is related to the work injury. *Gibbs v. Premier Scale Company/Indiana Scale Co.*, 50 S.W.3d 754, 763 (Ky. 2001), *as modified on denial of reh'g* (Aug. 23, 2001). Because he was successful before the ALJ, the question for us on appeal is whether the ALJ's finding of work relatedness is supported by substantial evidence. *Whittaker v. Rowland*, 998 S.W.2d 479, 481 (Ky. 1999). "Substantial evidence has been defined as some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable men." *Id.* at 481-82. Thus, the determinative question to be answered on review is whether the ALJ's finding that Parker's back condition is related to the work injury "is so unreasonable under the

6

evidence that it must be viewed as erroneous as a matter of law." KRS 342.285; *Ira A. Watson Dept. Store v. Hamilton,* 34 S.W.3d 48, 52 (Ky. 2000).

While we give great deference to the ALJ's factual findings, questions of law, *i.e.,* whether KRS 342.370(4) is constitutional, we review *de novo. See U.S. Bank Home Mortgage v. Schrecker,* 455 S.W.3d 382, 384 (Ky. 2014). With the preceding standards in mind, we first address Webster County's argument that the ALJ's finding that Parker suffered a work-related back injury is not supported by the evidence. We then address Parker's argument that KRS 342.730(4) is unconstitutional.

## III. ANALYSIS.

### A.   Whether Parker suffered a work-related back injury.

Webster County argues that there was not sufficient evidence to support a finding that Parker suffered a work-related back injury. It notes that Drs. Gavigan, Travis, and Goldman all opined that Parker's back condition actively pre-existed his September 2008 injury. It also notes that, although Dr. Eggers referred to an injury as being the cause of Parker's back condition in his Form 107, he did not specify which injury. Finally, Webster County notes that Parker's medical records and his testimony indicate that he had complaints of low back pain for several years preceding the September 2008 injury.

While Dr. Eggers's Form 107 may have been deficient regarding causation, he related Parker's back condition to the work injury in his initial office note. Furthermore, Dr. Travis's two reports are arguably inconsistent. Initially, Dr. Travis, who listed and summarized the medical records he

7

reviewed, opined that Parker's back condition was related to the work injury. In his second report, Dr. Travis listed and summarized those same medical records as supporting his opinion that Parker's back condition actively pre-existed the work injury. The ALJ was free to consider all of Dr. Eggers's records and to believe Dr. Travis's initial report and to disbelieve his second report. That evidence was substantive and sufficient to support the ALJ's finding of work-relatedness.

Furthermore, although Parker did complain of and receive treatment for low back pain prior to the work injury, he made no such complaints nor received any such treatment in the two years preceding the September 2008 work injury. In fact, Parker worked an average of 70 hours per week in that two-year period, and Webster County produced no evidence that any physician had assigned Parker an impairment rating or imposed permanent restrictions on Parker's work activities as a result of his pre-injury complaints of back pain. As stated in *Finley v. DBM Techs.*, 217 S.W.3d 261, 265 (Ky. App. 2007):

> a pre-existing condition that is both asymptomatic and produces no impairment prior to the work-related injury constitutes a pre-existing dormant condition. When a pre-existing dormant condition is aroused into disabling reality by a work-related injury, any impairment or medical expense related solely to the pre-existing condition is compensable. A pre-existing condition may be either temporarily or permanently aroused. If the pre-existing condition completely reverts to its pre-injury dormant state, the arousal is considered temporary. If the pre-existing condition does not completely revert to its pre-injury dormant state, the arousal is considered permanent, rather than temporary.

The ALJ's finding that Parker's back condition did not actively pre-exist the work injury but is related to that injury is supported by both the evidence

8

and the law. We cannot say the ALJ's finding was erroneous as a matter of law, and we therefore affirm it. *See Ira A. Watson Dept. Store*, 34 S.W.3d at 48.

## B. Whether KRS 342.730(4) is constitutional.

KRS 342.730(4) states in pertinent part that:

> All income benefits payable pursuant to this chapter shall terminate as of the date upon which the employee qualifies for normal old-age Social Security retirement benefits under the United States Social Security Act, 42 U.S.C. secs. 301 to 1397f, or two (2) years after the employee's injury or last exposure, whichever last occurs.

At the time of his injury, Parker was 68 years of age and qualified for "normal old-age Social Security retirement benefits." Under KRS 342.730(4), the ALJ found that Parker, who had received two years of temporary total disability benefits, was not entitled to any additional income benefits related to his permanent disability. Parker argues that KRS 342.730(4) unconstitutionally infringes on his right to due process, abrogates his jural rights, and violates the Equal Protection Clauses of the United States and Kentucky Constitutions. Webster County argues that, based on this Court's precedent, Parker's argument is without merit.

At the outset, we note that this Court previously determined that KRS 342.730(4) as it presently exists is constitutional.[3] *See McDowell v. Jackson Energy RECC*, 84 S.W.3d 71 (Ky. 2002); and *Keith v. Hopple Plastics*, 178

---

[3] In 1994, the legislature added paragraph (4) to KRS 342.730, which provided that workers' compensation income benefits would be reduced by 10% when an employee reached age 65 and by 10% every year thereafter until the employee reached age 70. In *Wynn v. Ibold, Inc.*, 969 S.W.2d 695 (Ky. 1998), we held that version of KRS 342.730(4) was constitutional. The legislature adopted the current version of KRS 342.730(4) in 1996.

S.W.3d 463 (Ky. 2005), *as corrected* (Dec. 13, 2005). We also are cognizant of the strong presumption of constitutionality afforded to legislative acts. *Id.* at 468. However, having reviewed our prior opinions, we now determine that they were incorrectly decided regarding the issue of equal protection. In doing so, we are:

> as always, mindful of the value of precedent and the doctrine of stare decisis. The doctrine of stare decisis "is the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." Changing the "ebb and flow of settled law" is not something we take lightly, and we do so only after careful consideration. While stare decisis "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals," it does not necessitate that this Court "unquestioningly follow prior decisions" when we are otherwise compelled. This Court is not assigned the duty of maintaining the watch as the law ossifies.

*Osborne v. Keeney*, 399 S.W.3d 1, 16–17 (Ky. 2012) (footnotes omitted).

The dissent questions our decision to re-visit *McDowell*, stating that the only change that has occurred since that opinion is to the composition of this Court. We do not disagree that the composition of the Court has changed; however, we note that the Court was closely divided on this issue in *McDowell*. Furthermore, this Court determined in 2011 that there was no rational basis for applying a different evidentiary standard to employees who contracted coal workers' pneumoconiosis than that applied to workers who contracted non-coal workers' pneumoconiosis. *See Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455 (Ky. 2011). This Court did so despite previously holding that a rational basis

existed for treating those two groups differently. *See Kentucky Harlan Coal Co. v. Holmes,* 872 S.W.2d 446 (Ky. 1994).[4]

It is undisputed that, because of KRS 342.730(4), injured older workers are treated differently from their younger counterparts. When a statutory provision results in disparate treatment, we look to the 14th Amendment of the United States Constitution and to Sections 1, 2, and 3 of the Kentucky Constitution. The goal of those constitutional provisions "is to 'keep[ ] governmental decision makers from treating differently persons who are in all relevant respects alike'" while recognizing that "nearly all legislation differentiates in some manner between different classes of persons." *Vision Mining,* 364 S.W.3d at 465 (citation and footnote omitted). In order to maintain the necessary balance between the goals of the constitutional provisions and legislative reality, the Courts apply different levels of scrutiny depending "on the classification made in the statute and the interest affected by it." *Id.*

> Currently, there are three levels of review applicable to an equal protection challenge. Strict or intermediate scrutiny applies whenever a statute makes a classification on the basis of a "suspect" or "quasi-suspect" class, respectively. Conversely, "if the statute merely affects social or economic policy, it is subject" to a less searching form of judicial scrutiny, i.e. the "rational basis" test.

---

[4] We recognize that the Court in *Holmes* specifically addressed the different basis for awarding benefits to employees who have contracted coal workers' vs. non-coal workers' pneumoconiosis, while the Court in *Vision Mining* was addressing the standard of proof and the consensus process. However, the dissent in *Vision* would have relied on *Holmes* to support affirming the disparate evidentiary standards and the consensus process. Regardless, the fact remains that this Court has revisited its decisions regarding the constitutionality of portions of KRS 342 when appropriate to do so.

*Vision Mining, Inc. v. Gardner,* 364 S.W.3d 455, 465–66 (Ky. 2011)(citations and footnotes omitted). "Workers' compensation statutes concern matters of social and economic policy. As a result, such a statute is not subject to strict or [intermediate] scrutiny and therefore must be upheld if a 'rational basis' or 'substantial and justifiable reason' supports the classifications that it creates." *Id.* at 466 (citation omitted).[5] Proving the absence of a rational basis or of a substantial and justifiable reason for a statutory provision is a steep burden; however, it is not an insurmountable one. *Id.* at 468-69.

The focus of the parties (and of the majorities in our prior decisions) is on the perceived discrimination between injured older workers and injured younger workers. This focus is understandable because, under the statute, a worker who is injured more than 425 weeks (or 520 weeks under certain circumstances) before he or she reaches normal Social Security retirement age will receive all of the permanent partial disability income benefits to which he or she is entitled.[6] A worker who is injured less than 425 weeks before he or

---

[5] We note that, while federal case law may be instructive regarding issues of equal protection, we are not bound to follow federal equal protection analysis. As we noted in *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408, 418 (Ky. 2005), "the Kentucky Constitution's equal protection provisions . . . are much more detailed and specific than the Equal Protection Clause of the United States Constitution." The analysis employed by our federal counter-parts acts as a floor, below which we may not fall, not as a ceiling, above which we may not rise. *Id.* In fact, "we have construed our Constitution as requiring a 'reasonable basis' or a 'substantial and justifiable reason' for discriminatory legislation in areas of social and economic policy." *Id.* at 418-19. In this case however, the preceding distinction, while important, is one without a difference because KRS 342.730(4) does not pass the less stringent rational basis test.

[6] This does not take into account any payment of temporary total disability income benefits, which could, as it did here, alter the number of weeks of entitlement to permanent disability benefits.

12

she reaches normal Social Security retirement age will not receive all of the permanent partial disability income benefits to which he or she is entitled. The rational bases for treating younger and older workers differently is: (1) it prevents duplication of benefits; and (2) it results in savings for the workers' compensation system. Undoubtedly, both of these are rational bases for treating those who, based on their age, have qualified for normal Social Security retirement benefits differently from those who, based on their age, have yet to do so.

However, the equal protection problem with KRS 342.730(4) is that it treats injured older workers who qualify for normal old-age Social Security retirement benefits differently than it treats injured older workers who do not qualify. As Justice Graves noted in his dissent in *McDowell*, "Kentucky teachers . . . have a retirement program and do not participate in social security." 84 S.W.3d at 79. Thus, a teacher who has not had any outside employment and who suffers a work-related injury will not be subject to the limitation in KRS 342.730(4) because that teacher will never qualify for Social Security retirement benefits. There is no rational basis for treating all other workers in the Commonwealth differently than teachers. Both sets of workers will qualify for retirement benefits and both have contributed, in part, to their "retirement plans." However, while teachers will receive all of the workers' compensation income benefits to which they are entitled, nearly every other worker in the Commonwealth will not. This disparate treatment does not accomplish the goals posited as the rational bases for KRS 342.730(4). The

13

statute does prevent duplication of benefits, but only for non-teachers because, while nearly every other worker is foreclosed from receiving "duplicate benefits," teachers are not.

The dissent indicates that our analysis should be limited to determining if the "overall statutory scheme unlawfully discriminates on the basis of age." According to the dissent, we have wrongly viewed this matter through the "lens" of teacher retirement and have concluded that "there is no rational basis for treating teachers differently from all other workers in the Commonwealth." To the contrary, what we have concluded is that there is no rational basis for treating all other workers in the Commonwealth differently from teachers.

The dissent also states that we have undertaken to reverse the Court of Appeals based on a reason not presented on appeal. However, we note that Parker has challenged the constitutionality of KRS 342.730(4) on equal protection grounds at every level. While he has not specifically mentioned the disparate treatment between teachers and all other employees in the Commonwealth, he has challenged the disparate treatment between those who qualify for normal old age social security retirement and those who do not. Thus, we believe that is sufficient to preserve the issue for our review.

As to the alleged savings to the workers' compensation program, we discern no rational basis for this disparate treatment. In *Vision Mining*, we addressed the evidentiary standard and claims' processing procedures that were being applied in coal workers' pneumoconiosis claims. We concluded that there was no rational basis for treating coal workers suffering from

14

pneumoconiosis differently from other workers suffering from pneumoconiosis. 364 S.W.3d at 473. In doing so, we rejected the employer's argument that the disparate treatment was justified because it resulted in monetary savings to the workers' compensation system. *Id.* at 472. ("The state would save more money by subjecting *all* occupational pneumoconiosis claimants to the more exacting procedure and higher rebuttable standard.")(emphasis in original). Furthermore, we noted that "[i]n considering an equal protection challenge, a court does not engage in accounting of debits and credits; rather the court must examine whether similarly situated individuals have been treated differently . . . and, if so, whether or not such treatment is rationally related to a legitimate state interest." *Id.* at 474. Here, injured older workers who qualify for normal old-age Social Security retirement benefits are treated differently than injured older workers who do not. There is no rational basis for treating these two groups of injured older workers differently.

The dissent states that KRS 342.730(4) is constitutional, despite its disparate treatment of older workers, because the exclusion of teachers from its benefit limitation is an example of acceptable "underinclusiveness." We agree with the dissent that a statutory scheme need not attack "every aspect of a problem" in order to pass constitutional muster; however such a statute must be "free from invidious discrimination." *Dandridge v. Williams*, 397 U.S. 471 (1970).[7] The problem with KRS 342.730(4) is not that it fails to attack

_____

[7] In *Dandridge*, the plaintiffs, who had large families, challenged the Maryland Department of Public Welfare maximum cap on AFDC benefits. 397 U.S. at 474-75. The Court determined that the cap did not violate equal protection. *Id.* at 487.

every aspect of the "problem" of injured workers collecting workers' compensation benefits and retirement benefits. The problem with KRS 342.730(4) is that it invidiously discriminates against those who qualify for one type of retirement benefit (social security) from those who do not qualify for that type of retirement benefit but do qualify for another type of retirement benefit (teacher retirement).[8] Based on the dissent's interpretation of underinclusiveness, this Court erred when it determined that it is unconstitutional to treat those who suffer from coal workers' pneumoconiosis differently from those who suffer from non-coal workers' pneumoconiosis. We discern no reason to reconsider the wisdom of that decision.

Finally, although Parker did not argue it, KRS 342.730(4) violates the prohibition against special legislation found in Section 59 of the Kentucky Constitution. "A special law is legislation which arbitrarily or beyond reasonable justification discriminates against some persons or objects and favors others." *Board of Ed. of Jefferson County v. Board of Ed. of Louisville*, 472 S.W.2d 496, 498 (Ky. 1971). As set forth above, KRS 342.730(4) favors

---

*Dandridge* differs from the case herein because the Maryland statute treated all AFDC recipients the same because all were subject to the cap. Here, KRS 342.730(4) treats two different groups of elderly workers differently.

[8] The dissent also cites to *Minnesota v. Clover Leaf Creamery Co.*, 499 U.S. 456 (1981) to support its underinclusiveness argument. However, as with *Dandridge*, *Clover Leaf Creamery* is distinguishable. In *Clover Leaf Creamery*, the state of Minnesota passed legislation regulating the sale of milk in plastic containers but permitting the sale of milk in cardboard containers. 449 U.S. at 456. The Court held that the statute bore a rational relationship to that state's goals of reducing landfill and reducing energy consumption. *Id.* at 458. The Minnesota statute treated different containers differently, but it treated all plastic containers, or containers of the same "class," the same. Here, KRS 342.730(4) treats younger and elderly workers differently, which is acceptable. However, it does not treat workers of the same "class," elderly workers, equally.

those who will not qualify for normal old-age Social Security retirement while discriminating against those who do qualify.

Because we have found KRS 342.730(4) to be constitutionally infirm on equal protection grounds, we need not address the other arguments raised by Parker.

## IV. CONCLUSION.

Having reviewed the record and the arguments of the parties, we discern no rational basis or substantial and justifiable reason for the disparate treatment of two groups of injured older workers. Thus, KRS 342.730(4) violates the right to equal protection and is constitutionally infirm. Our opinions to the contrary are hereby overruled, and this matter is remanded to the ALJ for entry of an opinion and award consistent with this opinion.

All sitting. Cunningham, Keller, Venters and Wright, JJ., concur. Minton, C.J., concurs in part and dissents in part by separate opinion, in which Hughes and VanMeter, JJ., join.

MINTON, C.J., CONCURRING IN PART AND DISSENTING IN PART: I fully concur with the majority's holding that there was sufficient evidence to support the ALJ's finding that Parker suffered a work-related injury. But I must respectfully dissent with regard to the majority's holding that KRS 342.730(4) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as an unlawful discrimination on the basis of age. I see no reason justifying our departure from well-established precedent on this exact same issue.

17

In conducting this constitutional analysis, I wholeheartedly follow the majority's general approach. The United States Supreme Court has consistently held that "age is not a suspect classification" for purposes of the Fourteenth Amendment. *See Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000). "Age classifications, unlike governmental conduct based on race or gender, cannot be characterized as 'so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy.'" *Id.* at 83. This standard echoes the one in place for equal-protection claims premised on social or economic-class discrimination. In such instances, no suspect class exists, and "a statute will comply with the Fourteenth Amendment's right to equal protection if it furthers a legitimate state interest and there is any conceivable rational basis for the classes it creates." *Keith v. Hopple Plastics*, 178 S.W.3d 463, 466 (Ky. 2005).

So there is no disagreement that the proper standard of review for equal-protection claims based on age or socioeconomic status is rational-basis review—the weakest tier of constitutional scrutiny on appeal. That is, so long as a statute is rationally related to a legitimate government interest, an examining court will not hold the act unconstitutional. *See Heller v. Doe*, 509 U.S. 312 (1993); *Keith*, 178 S.W.3d at 463. Legislative acts are as such presumed valid and the burden rests with the challenger to prove *no rational basis exists* for this classification. *See Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (emphasis added).

The rational-basis test imposes an admittedly enormously high bar for challengers seeking to invalidate perceived unconstitutional statutes. The United States Supreme Court has declared the rational-basis test is the proper measure for distinctions of this type for purposes of the Fourteenth Amendment, and, absent a finding that our own constitution offers heighted equal-protection rights, we are powerless to change that standard today. So in both the majority decision and in my interpretation, KRS 342.730(4) remains constitutionally valid so long as its goals are rationally related to a legitimate state interest. I unfortunately disagree with the majority's conclusion that the General Assembly has no rational basis in classifying the workforce in this manner.

We dealt with this precise issue just over a decade ago in *McDowell v. Jackson Energy RECC*, 84 S.W.3d 71 (Ky. 2002) and *Keith*. And in the time that has elapsed since, I see no changes or developments in the law other than the composition of this Court. There has been no adjustment in either Kentucky or federal law predicating reconsideration of the wisdom of these relatively recent rulings. As such, I vote to affirm this deeply rooted precedent.

In *McDowell*, we determined that KRS 342.740(4) exists to avoid duplication of income-replacement benefits. This structure reduces the overall cost of workers' compensation and improves the economic stability within state government. This reflects a similar policy goal from the pre-1996 tier-down structure that had previously been upheld by this Court. *See Wynn v. Ibold*, 969 S.W.2d 695 (Ky. 1998). And this view of the benefit structure as "wage-

19

loss" protection by placing a ceiling on combined benefits "was viewed widely as being sound public policy." *Keith,* 178 S.W.3d at 467 (referring to Arthur Larson and Lex K. Larson, 9 *Larson's Workers' Compensation Law* § 97.35(a) and (b) (Matthew Bender 1997)). The *McDowell* Court also relied on the United States Supreme Court decision in *Richardson v. Belcher,* 404 U.S. 78 (1971), in support of its holding. In *Belcher,* the Court rejected an equal-protection challenge to a portion of the Social Security Act that allowed social security disability benefits to be reduced through overlapping state workers' compensation benefits. *Belcher,* 404 U.S. at 92. The *McDowell* Court found no difference under the rational-basis standard between the federal offset provision and that found in KRS 342.730. And I agree.

The Commonwealth's goal of financial stability to ensure the overall viability of the state worker's compensation structure is not one I consider irrational. And it does so by first recognizing that workers' compensation exists to offset wage-loss resulting from workplace injury and then coordinating the receipt of benefits to avoid duplicate recovery. Essentially, the statute exists to prevent workers eligible for old-age social security benefits from "receiving greater workers' compensation benefits than similarly situated workers who are totally disabled." *Keith,* 178 S.W.3d at 468. Though the statute admittedly, and obviously discriminates against older workers, it advances a legitimate state goal of ensuring the overall viability and stability of the workers' compensation structure as a whole. While this may appear unfair and exploitative of some of

20

the Commonwealth's oldest and most vulnerable workers, I am not prepared to say it is unconstitutional to do so.

The majority opinion in fact agrees that the prevention of duplicate benefits and the continued solvency of the workers' compensation system are indeed rational bases for treating those who have qualified for normal social security retirement benefits differently from those who have yet to do so. And though it does not expressly say so, I imagine the majority would also find these state interests legitimate. So according to our highly deferential standard of review, the analysis should end there.

But the majority continues by contrasting the general workers' compensation structure with the teacher retirement system, a point not raised or argued to us or in the proceedings below. As the majority reminds us, teachers have their own retirement and do not participate in social security. So accordingly, an older teacher who suffers a workplace injury will never be subject to the limitation in KRS 342.730(4) because the teacher will never qualify for social security. This leads to the majority's ultimate conclusion that there is no rational basis for treating teachers differently from all other workers in the Commonwealth. But that is not the question before this Court in the case before us today.

In addressing this observation, the analysis is no longer a dispute over whether our overall statutory scheme unlawfully discriminates on the basis of age. Instead, the majority takes its eyes off the issue before us and refocuses attention on whether state government unconstitutionally distinguishes benefit

21

availability across different professions. And the majority is justified in recognizing this distinction. Perhaps there is indeed a novel question whether there is a rational basis (or whatever standard is invoked for distinctions of this type—if it even exists) to treat teachers differently from any other worker in the Commonwealth. Maybe the real question at the heart of that issue requires a close examination of the teacher retirement system to see whether there is a good reason to continue to exempt this profession from KRS 342.730(4), or whether this is simply a loophole in the system.

Those disparities considered, that statute simply is not before the court for our review. It has no doubt appeared in cases of this kind, to be sure, and it formed the central basis in Justice Graves's dissent in *McDowell*. The majority reprises Justice Graves's argument, though this time crafted as a majority opinion of this Court. But make no mistake, we have not been tasked with reviewing the exception retired teachers enjoy under the current parameters of the workers' compensation system. Even entertaining this argument, for the moment, leaves me equally unpersuaded. To me, viewing teacher retirement through the lens of this current matter, I am highly skeptical of its usefulness in conclusively determining that this statute — KRS 242.730(4) — violates the Fourth Amendment's guarantees of equal protection under the law. And the highly deferential rational-basis standard of review clinches the issue for me. For KRS 342.730(4) to remain constitutional, we need only consider *any reasonably conceivable* state of facts that could offer a rational basis for the classifications made by the General Assembly in drafting the statute. *See*

22

*Commonwealth Natural Res. & Envtl. Prot. Cabinet v. Kenetec Coal Co., Inc.*, 177 S.W.3d 718, 738 (Ky. 2005) (Cooper, J., concurring in part and dissenting in part). Though certainly some in the majority may conclude there is no conceivable basis of rationality in the statute's distinction altogether, comparison to the teacher retirement system offers us little to no guidance in reaching a determination either way. Under rational-basis review, "the possibility that a classification might result in some practical inequity does not cause it [the statute] to fail." *Id.* As the Supreme Court held in *Heller v. Doe by Doe*, 509 U.S. 312 (1993), a statutory classification can fail only if it is *completely* irrelevant to the achievement of what the majority admits are legitimate state interests. *Id.* at 324 (emphasis added).

Additionally, a statute's underinclusiveness in achieving its stated purpose is insufficient grounds to hold it unconstitutional under the rational-basis test. *See Kenetec Coal*, 177 S.W.3d at 740. In exercise of its constitutional powers, a legislature is "free to choose to remedy only part of a problem. It may select one phase of a field and apply a remedy there, neglecting the others." *Id.* (internal citations omitted). In *Dandridge v. Williams*, 397 U.S. 471 (1970), the Supreme Court held that the "Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. It is enough that the State's action be rationally based and free from invidious discrimination." *Id.* at 486-87. *See also Minnesota v. Clover Leaf Creamery Co.*, 499 U.S. 456, 466 (1981) ("[A] legislature need not strike at all evils at the same time or in the same way."). I

23

believe the General Assembly's failure to include all retired workers in its comprehensive workers' compensation scheme is this underinclusiveness doctrine at work. This incomplete application does not undermine the legislature's goals or undercut the rationality of its distinction; it only highlights its failure to perfectly tailor its interest across the board. But ultimately, the fact that the line may have been drawn differently at one point is a question more appropriately committed for legislative, rather than judicial, consideration. *See United States R.R. Ret. Bd. v. Fritz*, 499 U.S. 166, 179) (1980).

To me, this distinction actually mitigates accusations of ageism; the statutory distinction is more about benefit eligibility and less about age discrimination. A distinction between teachers and general workers undoubtedly exists, but I cannot say it is an age-based classification. I am unprepared and unwilling to evaluate these other equal-protection concerns today. I do recognize the majority's concerns, but I am uncomfortable departing from Court precedent at this juncture.

I must also further take issue that the majority opinion classifies KRS 342.730(4) as unconstitutional special legislation prohibited under Section 59 of the Kentucky Constitution. Unfortunately, like the teacher-retirement exception, no party raised this issue at any point in the proceedings below nor offered any arguments in their brief to us suggesting that this statute is special legislation. Although we may affirm a lower-court ruling for any reason appearing in the record, case law and our own judicial prudence dictate that

we should be reluctant to reverse a judgment for reasons not presented on appeal or argued below. And with respect to workers' compensation, KRS 342.285 further guides us; if the issue is not raised before an Administrative Law Judge, it may not be raised later on appeal. Because this issue appears for the first time in the majority opinion, we should refrain from addressing it without at least inviting the parties to brief this new constitutional argument.

I respectfully dissent as to these portions of the majority opinion.

Hughes and VanMeter, JJ., join.

COUNSEL FOR APPELLANT/APPELLEE MARSHALL PARKER:

Thomas Lawrence Hicks
Cetrulo, Mowery & Hicks, PSC

COUNSEL FOR APPELLEE/APPELLANT WEBSTER COUNTY COAL:

Stanley Shields Dawson
Fulton & Devlin LLC

COUNSEL FOR APPELLEES MULTICARE MADISONVILLE,
DR. RICHARD HOLZKNECHT, DEACONESS HOSPITAL,
COOP HEALTH SERVICES:

John C. Morton
Morton Law LLC

UNREPRESENTED APPELLEES:

David D. Eggers, M.D.
Neurosurgical Consultants
James M. Donley, M.D.
Center for Orthopedics
Wayne C. Cole, D.O.
Kelly L. Cole, D.O.